UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

AMANDA FISHER, *ET AL.*                      CIVIL ACTION

VERSUS                                        NO. 19-2448

UNITED STATES OF AMERICA,                     SECTION M (2)
*ET AL.*

**ORDER & REASONS**

Before the Court is the motion of the United States of America ("the USA") to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure,[1] to which plaintiffs Amanda and Christopher Fisher ("the Fishers") respond in opposition,[2] and in further support of which the USA replies.[3] Having considered the applicable law and the parties' memoranda, the Court issues this Order & Reasons granting the motion because the discretionary function exception of the Federal Tort Claims Act ("FTCA") applies, thus the USA has not waived sovereign immunity, and this Court lacks subject-matter jurisdiction over the action.

I.  **BACKGROUND**

This case involves a personal injury. On March 18 2017, the Fishers were hiking the Plantation Trail in the Barataria Preserve of Jean Lafitte National Historical Park and Preserve in Marrero, Louisiana.[4] The Fishers allege that they encountered muddy trail conditions and Amanda Fisher ("Mrs. Fisher") began to sink in the mud up to her calves.[5] To avoid the mud,

---

[1] R. Doc. 13.
[2] R. Doc. 16.
[3] R. Doc. 22.
[4] R. Doc. 1 at 7-8.
[5] *Id.* at 8.

Mrs. Fisher walked onto a raised wooden boardwalk, slipped, and fell causing injury.[6] The Fishers allege that after the accident, a park ranger who made his way to the scene stated that the trail should have been closed due to damage caused by feral hogs.[7] The Fishers contend that the park rangers knew of dangerous trail conditions but did not communicate the dangers to the Fishers, or close the trail, and that park rangers constructed the wooden boardwalks from materials known to be defective.[8]

The Park and Plantation Trail are managed by the National Park Service ("NPS") – a government agency under the Department of the Interior ("the DOI"). "The Barataria Preserve is a natural and historical resource … that consists of 25,000 acres of Louisiana wetlands … [and] is open to the public for recreational use, without fee."[9] Created by the NPS Organic Act, the NPS's stated "purpose is to conserve the scenery, natural and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. The NPS manages its mission under a hierarchy of authority: the Organic Act is the primary federal statute governing the NPS and its management of national parks; codified regulations govern at the next level (36 C.F.R. § 1.1, *et seq.*); followed by policy documents issued by the NPS under a three-tier directive system – tier 1 includes the NPS's Management Policies; tier 2 includes director's orders (*e.g.*, Director's Order #50C – NPS Public Risk Management Program); and tier 3 includes reference manuals, handbooks, and other guidance (*e.g.*, the NPS Sign Manual).[10]

---

[6] *Id.*
[7] *Id.* at 9.
[8] *Id.*
[9] R. Doc. 13-1 at 3 (citing R. Doc. 13-2 at 2).
[10] *Id.* at 11-14 (citing, *inter alia*, R. Docs. 13-2 at 3-7; 13-10). *See also* R. Docs. 13-4 through 13-7.

On October 26, 2017, pursuant to 28 U.S.C. § 2675(a), Mrs. Fisher provided notice of her injury claims to the DOI.[11] On February 8, 2018, the DOI denied Mrs. Fisher's claim and notified her of a six-month statute of limitations to file suit in federal court.[12] Christopher Fisher ("Mr. Fisher") did not present to the DOI any administrative claim concerning the accident.[13]

On June 11, 2018, within the prescriptive period, the Fishers filed suit in this Court, civil action no. 18-05801 (the "first action").[14] On December 28, 2018, the United States Magistrate Judge found that this Court lacked subject-matter jurisdiction over the Fishers' claims due to sovereign immunity and that a proposed amendment to their complaint was futile to remedy the jurisdictional defects.[15] Consequently, this Court dismissed the first action for lack of subject-matter jurisdiction.[16]

On March 18, 2019, the Fishers filed the instant action.[17] The Fishers allege that the USA is liable under the FTCA for Mrs. Fisher's injuries and damages for (1) failure to warn of known dangers, (2) failure to properly maintain the trail at issue, (3) failure to close the trail, (4) use of known defective materials in the construction of trail boardwalks, (5) failure to provide safety training for park staff, and (6) failure to "establish, implement, or enforce policies and procedure to warn" of dangerous conditions.[18] The Fishers also seek damages for Mr. Fisher's loss of consortium.

## II. PENDING MOTION

The USA filed the instant motion to dismiss arguing that this Court lacks subject-matter

---

[11] R. Docs. 1 at 5; 1-1.
[12] R. Docs. 1 at 5; 1-2.
[13] R. Docs. 13 at 4-6; 13-3 at 1-2.
[14] Case 18-cv-5801, R. Doc. 1.
[15] Case 18-cv-5801, R. Doc. 31.
[16] Case 18-cv-5801, R. Doc. 32. The Fishers subsequently filed a motion to reconsider this Court's dismissal (Case 18-cv-5801, R. Doc. 34), which this Court is denying as of this date.
[17] R. Doc. 1.
[18] *Id*. at 10-12.

jurisdiction over the Fishers' claims because they fall within the discretionary function exception of the FTCA, and therefore, the federal government has not waived its sovereign immunity.[19] The USA argues that no specific course of conduct was prescribed for the circumstances giving rise to this action and, further, that trail management and maintenance, including warning signage and boardwalk materials, are left to the discretion of NPS park managers who must balance "the competing interests of resource-conservation and visitor enjoyment both now and in the future."[20] The USA also states that because Mr. Fisher failed to file an FTCA administrative claim, this Court does not have subject-matter jurisdiction over Mr. Fisher's claims due to his failure to exhaust administrative remedies.[21]

In opposition, the Fishers contend that the USA is liable for Mrs. Fisher's injuries because NPS employees violated non-discretionary NPS policy when they failed to "eliminate, reduce or warn of [a trail] hazard" and that managing trail hazards does not implicate public policy but is rather a "garden-variety" slip-and-fall case based on property management and is thus outside the discretionary function exception to the waiver of sovereign immunity.[22] The Fishers conclude, then, that the park employees' decisions at issue are not the kind of decision-making Congress intended to shield under the exception.[23]

## III. ANALYSIS

### A. Rule 12(b)(1) Standard

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to challenge a court's subject-matter jurisdiction. "[A] claim is 'properly dismissed for lack of subject-matter

---

[19] R. Doc. 13-1.
[20] *Id*. at 10.
[21] *Id*. at 5-6. The Fishers concede that Mr. Fisher has no claim against the USA. R. Doc. 16 at 2 n.1. Accordingly, Mr. Fisher's claims are dismissed for lack of subject-matter jurisdiction for failure to exhaust administrative remedies pursuant to 28 U.S.C. § 2675. *See McAfee v. 5th Circuit Judges*, 884 F.2d 221 (5th Cir. 1989).
[22] R. Doc. 16 at 11, 15 & 20.
[23] *Id.*

jurisdiction when the court lacks the statutory authority or constitutional power to adjudicate' the claim." *Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018) (quoting *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012)). The party asserting jurisdiction bears the burden of proving that subject-matter jurisdiction exists. *Id.* "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "A motion to dismiss for lack of subject-matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to relief." *Sureshot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, 754 F. App'x 235, 235 (5th Cir. 2018) (citing *Wagstaff v. U.S. Dep't of Educ.*, 509 F.3d 661, 663 (5th Cir. 2007)).

### B. The FTCA's Discretionary Function Exception

The FTCA is a limited waiver of the United States government's sovereign immunity. *Coleman v. United States*, 912 F.3d 824, 835 (5th Cir. 2019) (citing 28 U.S.C. § 1346(b)(1)). Specifically, the FTCA provides a waiver of sovereign immunity for "civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Under the discretionary function exception, however, the federal government's waiver of immunity does not apply to "[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or

5

an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "[T]he discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz v. United States*, 486 U.S. 531, 537 (1988).

The Supreme Court established a two-part test to determine whether an agency or employee's conduct falls within the discretionary function exception, thereby restoring immunity for the federal government. *See id.* at 536-37. First, a court must inquire whether the challenged conduct "involves an element of judgment or choice" regardless of the actor's intent. *Id.* at 536. "Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* Second, "a court must determine whether [the] judgment is of the kind that the discretionary function exception was designed to shield" – namely, "decisions grounded in social, economic, and political policy." *Id.* at 536-37. Where a statute, regulation, or policy provides agency discretion, there exists "a strong presumption" that the government "agent's acts are grounded in [the same] policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991).

### C. Discretionary Function Analysis

As alleged by the Fishers, the conduct at issue is the NPS employees' (1) failure to warn of dangerous trail conditions, (2) failure to properly maintain the trail, (3) failure to close the trail, (4) use of defective materials in the construction of trail boardwalks, (5) failure to provide safety training for park staff, and (6) failure to establish, implement, or enforce policies and procedures to warn of dangerous conditions. The USA contends that the conduct at issue was discretionary in nature and that NPS employees must balance the agency's mission of preservation and conservation with public safety, when making choices about whether to warn

6

park visitors of conditions, close trails, use materials to construct trail features, and other public safety decisions.

Under the *Berkowitz* two-part test, this Court concludes that the discretionary function exception applies in this case and the federal government is immune to suit. First, the Court examines whether the challenged conduct involves an element of judgment or choice, as opposed to a prescribed course of action. Here, the park employees' decisions about trail maintenance, warning signage, and trail closure relating to natural hazards all involve elements of judgment and choice. No specific course of conduct was required for trail closures in the event of a hazard. The Fishers point to a regulation which authorizes NPS to close trails without warning in emergency situations (36 C.F.R. § 1.5) but the regulation does not ***require*** such a course of conduct. The Fishers further contend that an NPS director's order mandates that NPS should "[p]eriodically assess risks to park visitors … and when appropriate and feasible, eliminate or reduce hazards to visitors."[24] The phrase "when appropriate and feasible" necessarily connotes a balancing of factors to make a judgment about whether a park employee should address a putative hazard and, if so, "when and how" to manage it. *See Spotts v. United States*, 613 F.3d 559, 567 (5th Cir. 2010) ("If a statute, regulation, or policy leaves it to a federal agency to determine ***when and how*** to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary.") (emphasis added). Thus, whether to close a park trail involves elements of choice and judgment.

Additionally, no specific course of conduct is prescribed for warning signage. The Fishers point to the Director's Order #52C: Park Signs ("Order #52C") §§ 5 (program goals) and 7 (responsibilities) to support their contention that NPS employees violated sign standards. However, the program goals outlined in section 5 are inherently aspirational rather than a

---

[24]R. Doc. 13-7 at 13 (Director's Order #50C: Public Risk Management Program).

7

prescribed course of conduct. *See Gibson v. United States*, 809 F.3d 807, 812 (5th Cir. 2016) ("While the policy seemed nondiscretionary, it did not define what specific level of compliance was required and what remedial action the [agency] should take if it discovered insufficient compliance. … [Thus,] the policy was mere 'generalized, precatory, or ***aspirational*** language that [was] too general to prescribe a specific course of action for an agency or employee to follow.'") (reciting how the court in *Lopez v. U.S. Immigration & Customs Enf't,* 455 Fed. App'x. 427 (5th Cir. 2011), resolved the discretionary function exception, and quoting *Freeman v. United States*, 556 F.3d 326, 338 (5th Cir. 2009)) (emphasis added). Further, section 7 of Order #52C lists the responsibilities of NPS regional directors to create a sign program in their areas but it does not outline a specific course of conduct required to address trail hazards. This authority requires only that a sign program be established and generally outlines "goals" and "guiding principles"; it does not provide mandates for sign usage but reserves discretion for the regional director to create the program and decide when and how signs will be used.[25] The NPS Sign Manual provides:

> [T]he individual park manager … has the responsibility for determining whether or not a sign is necessary or appropriate at a given location. The decision to utilize a particular sign at a particular location requires the professional judgment of the park manager ….
>
> It is important … that such decisions bear in mind long standing NPS policy to minimally intrude upon the natural or historic setting in National Park System areas, and to avoid an unnecessary proliferation of signs, while striving to ensure for the safety of park visitors.[26]

The NPS Management Policies emphasize the discretion involved in making safety decisions: "These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendent and

---

[25] R. Doc. 13-6 at 2-5 (Order #52C §§ 4, 5 & 7).
[26] R. Doc. 13-5 at 2.

8

other decision-makers at the park level …. Examples include decisions about whether to install warning signs, … close roads and trails ….”[27] A director's order reiterates this point: "The means by which public safety concerns are to be addressed in each park falls under the discretion of the park's superintendent."[28] Certainly, signage to warn of hazards is a chief aim of park managers, but there sometimes exists a conflict between the competing goals of public safety and the preservation and conservation of a park's natural setting, a balancing act ultimately left to the discretion of park employees. For example, the NPS Management Policies caution: "Signs will be held to the minimum number, size, and wording required to serve their intended functions and to minimally intrude upon the natural and historic settings. They will be placed where they do not interfere with park visitors' enjoyment and appreciation of park resources."[29] Therefore, park managers are required to balance these concerns constantly and use their best judgment about when and how to provide signs to enhance public safety without intruding unduly on the natural and historic settings of the park or park visitors' enjoyment and appreciation of them.[30] Thus, decisions about warning signage also involve elements of judgment and choice.

Similarly, no specific course of conduct is prescribed for maintenance of trails, use of boardwalk materials, or safety training for park staff. The Fishers point to no authority establishing mandates for boardwalk construction or materials, trail maintenance, or training on safety policies. Section 9.2.2.2 of the NPS Management Policies states that wetlands, "where possible[,] … will be spanned by a boardwalk or other means, using sustainable materials that will not disturb hydrologic or ecological processes."[31] The Fishers make the conclusory

---

[27] R. Doc. 13-4 at 7 (Management Policies § 8.2.5.1).
[28] R. Doc. 13-7 at 2 (Director's Order #50C: Public Risk Management Program).
[29] R. Doc. 13-4 at 10 (Management Policies § 9.3.1.1).
[30] Additionally, although it does not inform the inquiry on whether an element of judgment or choice was involved, the USA notes that the Fishers were warned of the hazard they confronted by means of a sign at the trailhead stating that the trail was "slippery when wet" (R. Doc. 13-8) and a notice on the trail map stating that "hiking trails … in rainy periods, most are muddy and may be impassable." R. Doc. 13-9 at 2.
[31] R. Doc. 13-4 at 9.

assertion that the boardwalk was built with "non-sustainable materials," but they do not contest that it was the park's charge to weigh the choice of materials against the prospect that the materials might "disturb the hydrologic or ecological processes" in the park. The testimony of former park youth ambassador, Caleb Ezelle, about known slippery conditions does not demonstrate that NPS employees violated a prescribed course of conduct; instead, it supports the park's decision to post, and its posting of, a sign warning of slippery conditions when wet.[32]

In sum, the NPS must balance visitor safety with the preservation and conservation of the park's resources for the enjoyment of future generations. These occasionally competing concerns necessarily call for discretion in matters of safety mitigation, which is reflected in NPS policies. Thus, the first prong of the *Berkowitz* two-part test is satisfied because the conduct at issue here involved judgment and choice, not a prescribed course of conduct.

Under the second prong of the two-part test, this Court examines whether the NPS discretionary choices about safety mitigation are of the kind of agency judgments grounded in public policy that the discretionary function exception was designed to shield. *See Berkowitz*, 486 U.S. at 536-37. They are. At the outset, a strong presumption exists that conduct exercising granted authority is grounded in the same policy which confers discretionary authority. *Gaubert*, 499 U.S. at 324. Additionally, NPS regulations expressly state that the conduct as issue here (managing park trails) is discretionary because park employees must balance sometimes competing concerns of public safety and conservation in order to advance the mission of the NPS.[33] Moreover, courts routinely hold that the NPS's decisions of when and how to mitigate

---

[32] *See* R. Doc. 16 at 11-12. The USA objects to Ezelle's affidavit. R. Doc. 22 at 6 n.11. It is unnecessary for the Court to resolve this objection given its disposition of the motion, even considering the affidavit.

[33] *See, e.g.,* R. Docs. 13-4 (Management Policies) at 7 ("When practicable and consistent with congressionally designated purposes and mandates, the [NPS] will reduce or remove known hazards and apply other appropriate measures, including closures, guarding, signing, or other forms of education. In doing so, the [NPS's] preferred actions will be those that have the least impact on park resources and values."); 13-7 (Order #50C) at 2 ("Superintendents must make discretionary decisions that balance public recreation and safety with preservation of the protected natural, historic, or cultural setting.").

natural trail risks are based in the very public policy that confers its authority. *See, e.g.*, *Terbush v. United States*, 516 F.3d 1125, 1130 (9th Cir. 2008) ("Much of the NPS's work is 'grounded' in the Organic Act's broad mandate to balance conservation and access."). Thus, the Fishers have not overcome the strong presumption that NPS decision-making, management, and conduct in mitigating naturally-occurring trail risks are grounded in the same policy underlying the NPS's mission and authority to do so.

The Fishers urge this Court to categorize this matter as a "mundane … garden variety" slip-and-fall case, in line with case law holding that routine property maintenance or decisions made in the operation of a business as a private landowner are not the kind of decisions grounded in public policy the discretionary function exception was intended to shield and, therefore, the federal government's immunity should be waived. *See, e.g., Gotha v. United States*, 115 F.3d 176, 181 (3d Cir. 1997) (observing that a failure to provide sufficient lighting and handrails was "not about a national security concern, but rather a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get"); *O'Toole v. United States*, 295 F.3d 1029, 1032 (9th Cir. 2002) (finding discretionary function exception did not apply where government negligently maintained an irrigation system).

There is an important distinction between the government's acting as a private landowner or its acting as a wilderness landowner. "[W]hen the Government acts as landowner of wilderness, certain kinds of maintenance decisions have been found to contain multiple policy considerations." *Gibson*, 809 F.3d at 815. "[W]hen the NPS decides whether to warn of dangers that exist naturally in its national parks, those decisions generally are guided by considerations of policy." *Young v. United States*, 769 F.3d 1047, 1056 (9th Cir. 2014); *see also Terbush*, 516 F.3d at 1135-37 (noting that the NPS's decision not to warn of a rockfall hazard was grounded in

a broader public policy to balance conservation and safety); *Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) (observing that a decision not to warn of natural and obvious risk of a cliff "implicates a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards"). *But see Young*, 769 F.3d 1047 (reasoning that not posting warning signs by a 12-foot hole *created* by the NPS near a visitor center was not the type of policy judgment that was intended to be shielded by the discretionary function exception).

Here, a muddy condition caused by feral hogs is a naturally-occurring trail hazard rather than a dangerous condition caused by, or even closely controlled by, NPS employees. Whether or not to close the trail and how best to mitigate the naturally-occurring risk directly implicates the policies and mission of the NPS to preserve park resources, including the park's natural and historic setting, for the enjoyment of visitors. At the Plantation Trail, the NPS provided wooden structures to traverse muddy and wet conditions, and indeed warned visitors of slippery conditions at the trailhead and on the trail map. Although the Fishers now insist that the NPS's mitigation choices were insufficient for the danger, it is not the role of this Court to "second-guess" an agency's decisions grounded in a public policy undergirding its authority and mission. *Gaubert*, 499 U.S. at 323. The NPS conduct at issue in this case implicates policy considerations that the NPS must weigh and balance at the park level on a day-to-day basis, including whether to allow public safety concerns to intrude upon the competing interests of preserving a park's natural setting for the enjoyment of visitors for generations to come. Thus, the NPS's maintenance and preservation of miles of nature trails is akin to the Army Corps of Engineers' maintenance of miles of waterways – properly categorized as "quintessentially discretionary," rather than routine property maintenance. *See MS Tabea Schiffahrtsgesellschaft MBH & Co. v. Bd. of Comm'rs of Port of New Orleans*, 636 F.3d 161, 163 (5th Cir. 2011) (finding Corps'

dredging decisions in maintaining navigability of the Mississippi River fell under the discretionary function exception).

Government agencies are often required to balance competing considerations before deciding upon a course of action: when such decisions are discretionary and policy-driven, they are protected by the strong presumption in favor of the discretionary function exception. *Id.* (considering whether dredging projects were "economically justified or environmentally acceptable"). The Fishers have not overcome the presumption that the NPS's decisions in managing the Plantation Trail, which were animated by the same public policy and mission underlying the authority granted the NPS by the Organic Act, are entitled to the protection afforded by the discretionary function exception. Thus, the exception applies, and the USA's sovereign immunity from suit has not been waived for the conduct at issue. Consequently, this Court has no subject-matter jurisdiction to proceed with this matter.

## IV. CONCLUSION

Accordingly, and for the foregoing reasons,

**IT IS ORDERED** that the USA's motion to dismiss (R. Doc. 13) is **GRANTED,** and this action is hereby **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.

New Orleans, Louisiana, this 31st day of August, 2019.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE